FM 103.1, INC. and Jukebox
Radio, Inc., Plaintiffs,

v.

UNIVERSAL BROADCASTING OF NEW
YORK, INC., et al., Defendants.

Civil Action No. 96–1659(AJL).

United States District Court,
D. New Jersey.

April 24, 1996.

**190**

Michael A. Manna, Michael A. Manna & Associates, P.C., Ridgewood, New Jersey, for Plaintiffs.

Brian M. Chewcaskie, Gittleman, Muhlstock, Chewcaskie & Kim, Fort Lee, New Jersey, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiffs FM 103.1, Inc. and Jukebox Radio, Inc. (collectively "Jukebox") against defendants Universal Broadcasting of New York, Inc. ("Universal"), Howard Warshaw and Miriam Warshaw (collectively the "Defendants") seeking a temporary restraining order and preliminary and permanent injunctive relief enjoining Defendants from alleged service mark infringement, unfair competition and passing off under section 43(a) of the Lanham Act, as amended 15 U.S.C. § 1125(a), N.J.S.A. 56:4–1 and state common law. A complaint (the "Complaint") was filed on 15 April 1996. Jurisdiction is alleged pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b) and 1367(a). Currently before the court is a motion for a temporary restraining order and a preliminary injunction filed by Jukebox (collectively the "Motion for Injunctive Relief").[1] For the reasons set forth below, the Motion for Injunctive Relief is denied.

*Facts*

A. *The Parties*

FM 103.1, Inc. and Jukebox Radio, Inc. are corporations incorporated under the laws of the State of New Jersey. Complaint, ¶¶ 4–5. Jukebox creates radio programming for WJUX–FM, a station broadcasting from Monticello, New York, whose signal reaches Orange, Ulster, Putnam and Sullivan Counties, New York, Sussex County, New Jersey and Wayne and Pike Counties, Pennsylvania. Turro Dec., ¶ 13; Complaint, ¶¶ 6, 10. WJUX–FM's programming is distributed and repeated on translators located in Pomo-

---

1. In support of the Motion for Injunctive Relief, Jukebox submitted: Memorandum of Law In Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Jukebox Brief"); Declaration of Gerard A. Turro, with exhibits A through H ("Turro Dec."); Declaration of Michael A. Manna, Esq., with exhibits A through D ("Manna Dec."); Declaration of Bruce Emra ("Emra Dec."); Declaration of Jay Epstein ("Epstein Dec."); Reply Memorandum of Law In Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Jukebox Reply Brief"); Reply Declaration of Gerard A. Turro ("Turro Reply Dec."); Declaration of Eric McCormick, Esq. ("McCormick Dec."); Declaration of Herbert D. Miller, Jr., Esq., with exhibit ("Miller Dec."); Affidavit of Mark Ninehan, with exhibits A through C ("Ninehan Aff."); Second Reply Declaration of Gerard A. Turro ("Turro Second Reply Dec.").

In opposition to the Motion for Injunctive Relief, the Defendants submitted: Defendants' Brief In Opposition to Temporary Restraints (the "Defendants Brief"); Affidavit of Howard Warshaw ("Warshaw Aff.").

na, New York (94.3 FM) and Bergen County, New Jersey (103.1 FM). Complaint, ¶¶ 6, 10. As of January 1994, Jukebox became the successor-in-interest to Bergen County Community Broadcast Foundation, Inc. ("BCCBF"). Turro Dec., ¶ 11; Complaint, ¶ 10.

Universal is a corporation incorporated under the laws of the State of New York. Complaint, ¶ 7. Universal owns the radio station WVNJ–AM (1160 AM). *Id.,* ¶ 23. In the latter part of 1995, WVNJ–AM switched its format and began broadcasting big band music. *Id.,* ¶ 27. Miriam Warshaw is President of Universal and Howard Warshaw is Vice President of Universal. *Id.,* ¶¶ 8–9. Jukebox alleges Miriam Warshaw and Howard Warshaw personally directed the alleged acts of infringement, unfair competition and passing off. *Id.*

B. *The Alleged Service Marks*

Jukebox states from May 1993 to present it or BCCBF has used the alleged service mark "YOUR HOMETOWN RADIO STATION" to identify itself and its programming, repeating the phrase on-air approximately seventy times each day. Turro Dec., ¶ 20; Complaint, ¶ 11. Jukebox contends it has used the phrase "YOUR HOMETOWN RADIO STATION" in connection with promotional materials and on-air endorsements. Turro Dec., ¶ 23; *see also* Complaint, ¶¶ 12–13. Jukebox submitted five newspaper articles discussing the radio station, one of which makes reference to Jukebox's use of the phrase "BERGEN COUNTY'S HOMETOWN RADIO STATION." Turro Dec., ¶ 26 and Exh. E–2; *see also* Complaint, ¶¶ 12–13.

In January 1994, Jukebox began broadcasting a daily on-air program entitled MAKE BELIEVE BALLROOM and featuring big band music of the 1940s and 1950s. Turro Dec., ¶ 16; Complaint, ¶ 14. Jukebox alleges it used the phrase "MAKE BELIEVE BALLROOM" to identify the program since its inception in 1994. Complaint, ¶ 14. Jukebox further alleges it used the phrase "MAKE BELIEVE BALLROOM" following abandonment of the service mark by New York station WNEW–AM. *Id.,* ¶ 15.

In 1992, WNEW–AM had stopped broadcasting music and switched to an all-talk format. *Id.,* ¶ 16.

Jukebox "purchased from WNEW [in 1992], *inter alia,* the entire music library which formed the basis for [WNEW–AM's] MAKE BELIEVE BALLROOM program, including the opening musical theme of the program, entitled 'It's Make Believe Ballroom Time.' " *Id.;* Turro Dec., ¶ 10. Jukebox states it promoted its MAKE BELIEVE BALLROOM program vigorously, repeating the phrase "MAKE BELIEVE BALLROOM" on-air more than thirty-five time each day. Turro Dec., ¶ 19; *see also* Complaint, ¶ 17. Jukebox alleges it has used the phrase "MAKE BELIEVE BALLROOM" in connection with promotional materials and on-air endorsements. *Id.,* ¶¶ 18–19. Of the five newspaper articles Jukebox submitted, none referred to Jukebox's MAKE BELIEVE BALLROOM program. *See* Turro Dec., ¶ 26; *see also* Complaint, ¶¶ 18–19.

C. *Defendants' Use of the Alleged Service Marks*

Jukebox contends WVNJ–AM began using the phrase "YOUR HOMETOWN RADIO STATION" to identify itself and its programming in or around December 1995. Turro Dec., ¶ 34; *see also* Complaint, ¶ 28. Defendants state, however, they have used the phrase "HOMETOWN RADIO STATION" since August 1995. Warshaw, ¶ 7. Jukebox states WVNJ–AM has expanded its use of the phrase "YOUR HOMETOWN RADIO STATION" since hiring ten of Jukebox's staff beginning in May 1995. Turro Dec., ¶¶ 35, 43; *see also* Complaint, ¶¶ 29–30. Jukebox submitted a copy of a WVNJ–AM advertisement in which WVNJ–AM refers to itself as "NORTH JERSEY'S HOMETOWN RADIO STATION." Turro Dec., ¶ 39 and Exh. F.

Jukebox claims that on or about 26 February 1996 Defendants began using the name "MAKE BELIEVE BALLROOM" in connection with a big band music program airing during a "virtually ... identical time slot" as the Jukebox program and featuring the same theme song "It's Make Believe Ballroom Time." Complaint, ¶ 31; *see also* Turro

Dec., ¶ 37. Jukebox alleges Defendants have recently promoted their program as the "ORIGINAL MAKE BELIEVE BALL-ROOM." Complaint, ¶ 31. WVNJ–AM's MAKE BELIEVE BALLROOM program is hosted by disc jockey Bill Owen who, until February 1996, had been employed at Juke-box where he was the on-air host of Juke-box's MAKE BELIEVE BALLROOM program. Turro Dec., ¶¶ 36–37; Complaint, ¶ 32.

Jukebox asserts WVNJ–AM's use of the alleged service marks and hiring of Jukebox employees has caused confusion. The evidence presented by Jukebox of this alleged confusion consists of three examples. First, according to an employee of Jukebox, Dara Hershman, General Manager of the John Harms Center for the Arts, inquired "whether or not Jukebox had the right to use the service mark MAKE BELIEVE BALL-ROOM, because she had seen WVNJ–[AM]'s use of the [same] service mark." Epstein Dec., ¶ 3. According to the president of Jukebox, Geoffrey Moore of the Bergen County Museum of Arts and Science "expressed concern that WVNJ[–AM] ... was also using the service mark MAKE BE-LIEVE BALLROOM." Turro Dec., ¶ 47. Bruce Emra, radio listener, stated that WVNJ–AM and Jukebox "seemed so similar" because they have the "same big band format ... and also broadcast the same service marks." Emra Dec., ¶¶ 11, 14.

D. *Efforts By Jukebox to Stop Defendants' Use of the Alleged Service Marks*

On 20 March 1996, Jukebox wrote Defendants requesting they cease and desist from using the alleged service marks. Manna Dec., ¶ 2 and Exh. A. On 21 March 1996,

Defendants requested Jukebox provide documentation of service mark registration for the two phrases. Manna Dec., ¶ 2 and Exh. B. On 22 March 1996, Jukebox repeated its demand Defendants cease and desist from using the alleged service marks without providing documentation of service mark registration. Manna Dec., ¶ 3 and Exh. C. On 27 March 1996, Defendants informed Jukebox it considered its claims to exclusive use of the alleged service marks without basis in law or fact. Manna Dec., ¶ 4 and Exh. D. Defendants have not stopped using the alleged service marks.[2] Complaint, ¶ 36.

Defendants contend countless radio stations, both locally and across the nation, refer to themselves as that market's "Hometown Radio Station." Warshaw Aff., ¶ 6. Defendants also contend the phrase "MAKE BELIEVE BALLROOM" is identified with big band music through common usage. *Id.*, ¶ 8. Defendants point to several examples of the use of the phrase "MAKE BELIEVE BALLROOM" or similar phrases to describe big band music: a song entitled "It's Make Believe Ballroom Time", a radio program broadcast since the 1970s to portions of New Jersey entitled "America's Ballroom", a Saturday night music program in which songs are introduced with the phraseology "coming in from the make believe ballroom, here's a song entitled...." broadcast into the Bergen County market from radio station WQEW in New York City and a radio station in Boca Raton, Florida which uses the phrase "MAKE BELIEVE BALLROOM." *Id.*, ¶¶ 9–13.

On 15 April 1996, Jukebox filed the Complaint initiating this action. Jukebox presently seeks a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Proce-

---

2. Defendants argue Jukebox does not have standing to bring this action because the F.C.C. ordered Jukebox to either (1) cease from having any interest in or other connection with WJUX–FM if it continues to rebroadcast WJUX–FM's off-air programming over one or both of the translator stations or (2) cease from rebroadcasting WJUX–FM's off-air programming over either one or both of the translator stations. *See* Defendants Brief at 8–9; Warshaw Aff., ¶¶ 15–23. Jukebox states its intends to appeal or seek administrative review of the F.C.C. decision. *See*

Jukebox Reply Brief at 8–10; Turro Reply Dec., ¶ 4; *see also* Miller Dec., ¶ 7. Jukebox further states it has no intention of discontinuing use of the alleged service marks, no intention of discontinuing producing programming and no intention of discontinuing providing programming to WJUX–FM in Monticello, New York for broadcast and rebroadcast on translators in Pomona, New York and Fort Lee, New Jersey. Turro Reply Dec., ¶¶ 5–6. At this time, it appears the F.C.C. order does not affect Jukebox's ability to seek injunctive relief.

dure enjoining the alleged service mark infringement, unfair competition and passing off under section 43(a) of the Lanham Act, as amended 15 U.S.C. § 1125(a), N.J.S.A. 56:4–1 and state common law.

*Discussion*

### A. Preliminary Injunction and Temporary Restraining Order Standards

■ In this Circuit, a preliminary injunction is issued upon review of four factors:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir. 1990); *Tyco Indus., Inc. v. Tiny Love, Ltd.,* 914 F.Supp. 1068, 1071 (D.N.J.1996); *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 893 F.Supp. 301, 307 (D.N.J.1995); *Bakery Drivers & Salesmen Local 194 v. Harrison Baking Group, Inc.,* 869 F.Supp. 1168, 1176 (D.N.J. 1994); *Gruntal & Co. v. Steinberg,* 854 F.Supp. 324, 331 (D.N.J.), *aff'd,* 46 F.3d 1116 (3d Cir.1994) (table).

■ Of these four requirements, the Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: " '[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.' " *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989); *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987).

■ Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union,* 945 F.2d 628, 634 (3d Cir.1991), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air,* 882 F.2d at 800; *United States v. City of Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also E.B. v. Poritz,* 914 F.Supp. 85, 90 (D.N.J. 1996) (" '[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction' ") (quoting *Falter v. Veterans Admin.,* 632 F.Supp. 196, 201 (D.N.J.1986)); *Bakery Drivers,* 869 F.Supp. at 1177; *Gruntal & Co.,* 854 F.Supp. at 332. An injunction should be issued only if the plaintiff produces evidence sufficient to convince the court all four factors favor preliminary relief. *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *S & R Corp.,* 968 F.2d at 374; *Opticians Ass'n of Am.,* 920 F.2d at 192; *accord E.B.,* 914 F.Supp. at 90. The grant or denial of a preliminary injunction lies within "the sound discretion of the district judge, who must balance all of these factors in making a decision." *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir. 1982); *accord Atlantic Coast Demolition,* 893 F.Supp. at 307.

In order to obtain a temporary restraining order, the moving party must demonstrate immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition. Fed.R.Civ.P. 65(b). As set forth below, Jukebox has not shown any violation of its statutory or common law rights and therefore cannot demonstrate any injury, loss or damage.

### B. Infringement Under Section 43(a) of the Lanham Act

■ Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, · or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities—shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Section 43(a)(1) of the Lanham Act protects unregistered service marks in the same manner and to the same extent as registered marks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615, *rehearing denied*, 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992); *accord Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905, 911 (D.N.J.1976) ("[t]rademark rights arise from use and not registration").

■ For a service mark infringement claim to prevail, the plaintiff must establish (1) the names are distinctive and thus protectable service marks, (2) the service marks are owned by the plaintiff and (3) use of the same mark by defendant is likely to create confusion among the relevant consumers. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1135–37 (D.N.J.1993). A service mark is defined as "any word, name, symbol, or device, or any combination thereof ... [used] to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services." 15 U.S.C. § 1127.

■ To determine distinctiveness, service marks are "often classified in categories of generally increasing distinctiveness." *Two*

*Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757. The categories, ranging from inherent distinctiveness to no distinctiveness, are (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive and (5) generic. *Id.* Fanciful, arbitrary and suggestive terms exhibit the greatest amount of inherent distinctiveness and will generally automatically qualify for service mark protection. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986); *Birthright*, 827 F.Supp. at 1137. A generic term is never protectable. *A.J. Canfield*, 808 F.2d at 297; *Birthright*, 827 F.Supp. at 1137. Federal registration of a service mark creates a presumption the mark is not generic but even a registered mark can be found to be generic. *See, e.g., WSM, Inc. v. Hilton*, 724 F.2d 1320 (8th Cir.1984) (presumption overcome); *Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457 (D.Md.1988) (same), *aff'd*, 870 F.2d 654 (4th Cir.1989).

■ Service marks which are "merely descriptive of a [service] are not inherently distinctive ... [and when] used to describe a [service], ... cannot be protected." *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757. Descriptive marks, however, can be protected if the marks acquire a secondary meaning. *Id.; Birthright*, 827 F.Supp. at 1137. Secondary meaning is shown when the primary significance of the term in the minds of the consuming public is not the product but the producer. *Scott Paper*, 589 F.2d at 1228; *see also 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987).

1. *Distinctiveness of the Alleged Service Marks*

■ To determine whether a mark is descriptive or suggestive, a series of issues should be considered. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 11.21, 11.22 (3d ed. 1992) ("*McCarthy on Trademarks*"). First, the level of imagination required of the potential customer in trying to cull a direct message from the mark about the quality or characteristics of the service must be examined. *Trustco Bank v. Glens Falls Nat'l Bank & Trust Co.*, 903 F.Supp. 335, 342 (N.D.N.Y.1995); *see McCarthy on Trade-*

*marks,* § 11.21[1] at 11–107 to 11–109. The more imagination and thought required, the more likely the mark is suggestive. *Id.*

■ Second, a court should question whether the mark so closely tells something about the service that other sellers of like services would be likely to want to use the term in connection with their services. *Trustco Bank,* 903 F.Supp. at 342; *see McCarthy on Trademarks,* § 11.21[2] at 11–109 to 11–111. If not, the mark is suggestive. *Id.*

■ Third, evidence other sellers are using this term to describe their products must be considered. *Trustco Bank,* 903 F.Supp. at 342; *see McCarthy on Trademarks,* § 11.21[3] at 11–111 to 11–112. "Even if a mark is descriptive but has attained a secondary meaning, if many others in other product markets are using the term, the mark may be labeled 'weak' and entitled only to narrow protection." *Id.; see also U.S. Express, Inc. v. U.S. Express, Inc.,* 799 F.Supp. 1241, 1246 (D.D.C.1992).

■ Fourth, the court must examine if the mark conjures up some other, purely arbitrary connotation separate from what the mark conveys about the services. *Trustco Bank,* 903 F.Supp. at 342; *see McCarthy on Trademarks,* §§ 11.21, 11.22. If so, the mark is suggestive. *Id.*

■ Last, whether consumers are likely to regard the mark as a symbol of origin or merely another form of self-laudatory advertising should be evaluated. *Trustco Bank,* 903 F.Supp. at 342; *see McCarthy on Trademarks,* §§ 11.21, 11.22. Self-laudatory advertising does not connote suggestiveness. *Id.*

### a. Alleged Service Mark "YOUR HOMETOWN RADIO STATION"

■ Application of these criteria to the term HOMETOWN has been considered before. In *Trustco Bank,* Trustco Bank ("Trustco") used the unregistered mark "HOME TOWN BANK" and sought to enjoin Glens Falls National Bank from using the phrase "THE ORIGINAL HOMETOWN BANK." 903 F.Supp. at 338. The court

held the alleged mark was descriptive rather than suggestive because it did not

require much imagination, reflection, or multi-stage reasoning to infer that [by using the mark], Trustco intends to convey a friendly, service-oriented atmosphere, ... it is likely ... other banks would want to use the term in connection with their own services, ... non-banking businesses use the term "HOMETOWN" in their titles, ... "HOME TOWN BANK" is not likely to conjure up a purely arbitrary connotation, but rather a particular atmosphere or orientation toward serving its customers [and] Trustco ... has not shown ... customers regard the use of the phrase as anything other than a form of self-laudatory advertising.

*Id.* at 342–43. At this point in the litigation, Jukebox has not presented any evidence demonstrating the use of the slogan "YOUR HOMETOWN RADIO STATION" is anything more a descriptive mark.

■ Because the phrase "YOUR HOMETOWN RADIO STATION" appears to be descriptive, Jukebox must establish the mark has acquired a secondary meaning. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2757; *Birthright,* 827 F.Supp. at 1137; *see Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir.1993); *Perini Corp. v. Perini Constr.,* 915 F.2d 121, 125 (4th Cir.1990); *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985); *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 787 (5th Cir.1984). Determining whether a service mark has acquired a secondary meaning involves the examination of several factors including advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the services and the mark, sales success, attempts to plagiarize the mark and the length and exclusivity of the mark's use. *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1222 (2d Cir.1987); *Trustco Bank,* 903 F.Supp. at 342. No single factor is determinative and every element need not be proved. *Id.* The party seeking protection of the mark bears the burden of proving a secondary meaning has attached. *Boston Beer,* 9 F.3d at 181; *Bristol–Myers Squibb Co. v.*

*McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir.1992); *U.S. Express*, 799 F.Supp. at 1244.

■ Large advertising or promotion expenditures do not contribute to establishing a secondary meaning unless the moving party explains how its efforts were effective in causing the relevant group of consumers to associate the mark with itself. *See, e.g., Security Ctr. Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1300–01 (5th Cir.1985) (no secondary meaning despite extensive advertising and plaintiff's use of the name two years prior to the time defendant began using the term); *Trustco Bank*, 903 F.Supp. at 342 (no secondary meaning regardless of Trustco's over $14 million expenditure advertising itself as the "HOME TOWN BANK"); *U.S. Express*, 799 F.Supp. at 1246 ($50,000 spent on advertising does not indicate consumers associated the name of service with plaintiff); *Blacks in Government v. Nat'l Ass'n of Blacks Within Government*, 601 F.Supp. 225, 228–29 (D.D.C.1983) (declining to find a secondary meaning attaching to term "Blacks in Government" despite organization's age, size, advertising expenditures and media attention).

■ While Jukebox has submitted evidence of expenditures made for promotion, Jukebox has not provided any evidence or arguments showing how its efforts were effective in causing the relevant group of radio listeners to associate the mark "YOUR HOMETOWN RADIO STATION" with itself. In addition, while the newspaper articles and single consumer affidavit [3] are useful, they alone are not sufficient to show a

secondary meaning. *See, e.g., U.S. Express*, 799 F.Supp. at 1247 (single instance of confusion over several year period "hardly buttresses" secondary meaning claim).

### b. Alleged Service Mark "MAKE BE-LIEVE BALLROOM"

■ While Federal registration of a service mark creates a presumption the mark is not generic, Defendants have demonstrated a strong possibility of overcoming this presumption. Defendants argue the mark "MAKE BELIEVE BALLROOM" has become so identified with big band music that the mark has become generic through common usage to describe a type of music. Defendants Brief at 5–7; *see, e.g., BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed.Cir.1995) (phraseology "let your fingers do the walking" is generic advertising for telephone directories); *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir.1989) (term "murphy bed" is generic to describe a bed that can fold into a wall closet); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14–15 (2d Cir.1976) (term "safari" is generic to describe clothing); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79–80 (7th Cir.1977) (terms "light" or "lite" are generic to describe beer); *DuPont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75, 80–81 (2d Cir.) (term "cellophane" is generic to describe clear wrapping), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936).

Defendants have cited numerous uses of the mark "MAKE BELIEVE BALLROOM." *See* Warshaw Aff.[4] It is reasonably likely

---

**3.** Jukebox submitted information concerning statements by three individuals. *See* Epstein Dec., ¶ 3; Turro Dec., ¶ 47; Emra Dec., ¶¶ 11, 14. Only one of the three individuals, however, submitted a signed affidavit identifying himself as a member of the relevant consumer group. *See* Emra Dec., ¶¶ 5–7, 15.

**4.** In addition to uses cited by Defendants, several other uses of the alleged mark "MAKE BELIEVE BALLROOM" were revealed through research. *See, e.g., Album Reviews*, Billboard, 6 May 1995 (reviewing album by band named "THE MAKE BELIEVE BALLROOM"); Judy Raphael, *Cliques; Seems Like Old Times*, L.A. Times, 3 Apr. 1994, at 9 (referring to annual jazz reunion as creating a "MAKE–BELIEVE BALLROOM" atmosphere); Mike Joyce, *Natalie Cole, Unfor-*

*gettably*, Washington Post, 25 Aug. 1993, at D7 (referring to Natalie Cole performance with a full orchestra as creating a "MAKE–BELIEVE BALLROOM"); Nancy Kapitanoff, *Art Notebook*, L.A. Times, 8 Dec. 1991, at 95 (describing lithograph depicting Fred Astaire and Rita Hayworth entitled "MAKE BELIEVE BALLROOM"); Sharon Kirby, *Clearwater Times*, St. Petersburg Times, 12 May 1989, at 12 (mentioning Florida radio station program entitled "THE MAKE–BE-LIEVE BALLROOM"); *Critics Picks*, Washington Post, 9 June 1985, at F5 (discussing series of Friday night dances "in the big band style" called "MAKE BELIEVE BALLROOM"); *see also* Peter Goddard, *Why the BBC Decided to Ban the Beatles Radio*, Toronto Star, 16 Mar. 1996, at K9 (mentioning Toronto radio station program entitled "MAKE BELIEVE BALLROOM"); Mike

Defendants will present admissible evidence regarding the common usage of· the mark "MAKE BELIEVE BALLROOM."

### c. *Registration of Service Marks*

In its reply papers, Jukebox produces registration of the marks "HOMETOWN RADIO" and "MAKE BELIEVE BALLROOM" by third-parties. McCormick Dec., ¶¶ 6–7; Ninehan Aff., ¶¶ 4–5 and Exhs. A–B.[5]

### i. *Geographic Markets*

▮▮▮▮▮ Jukebox asserts third-party registration of the mark "HOMETOWN RADIO" establishes its alleged service mark "YOUR HOMETOWN RADIO STATION" is inherently distinctive and entitled to protection. Jukebox Reply Brief at 2. Jukebox does not, however, properly address the issue of geographic markets. A single, conclusory sentence void of any legal citation does not establish non-competitive geographic markets. *See* Jukebox Reply Brief at 4 n. 1. It is not necessary for service mark infringement that the services of the parties be in direct competition in the same geographic market. *See, e.g., Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir. 1965) (AMERICANA hotel in New York City, Miami Beach and Puerto Rico enjoined use of AMERICANA by hotel in Chicago); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818 (D.N.J.1980) (CAESARS PALACE casino in Las Vegas enjoined use of CAESARS PALACE by beauty salon in New Jersey); *Brass Rail, Inc. v. Ye Brass Rail of Mass., Inc.,* 43 F.Supp. 671 (D.Mass. 1938) (BRASS RAIL restaurant in New York City enjoined use of BRASS RAIL by restaurant in Boston).

Jukebox produced evidence indicating the mark "HOMETOWN RADIO" was registered by a Missouri company for use in connection with radio broadcasting services. *See* Ninehan Aff., Exh B. Jukebox has not produced any evidence regarding the Missouri company's use of its registered mark. It cannot be assumed that there is no competition between Jukebox and the Missouri company. For example, perhaps the Missouri company produces a nationally-broadcast radio program on which the mark "HOMETOWN RADIO" is used. Jukebox has the burden of proving its asserted claims and must demonstrate that it is not in the same geographically competitive market as the holder of the registered service mark "HOMETOWN RADIO."

### ii. *Ownership of the Mark "MAKE BELIEVE BALLROOM"*

Jukebox argues it was the first user of the mark "MAKE BELIEVE BALLROOM" after it was abandoned by WNEW–AM.[6]

---

Boone, *CJAD, at 50, Still Tops With Anglo Montreal,* Gazette, 7 Dec. 1995, at A1 (mentioning Montreal radio station program entitled "MAKE BELIEVE BALLROOM").

**5.** Near the close of business the day before argument on the Motion for Injunctive Relief, Jukebox submitted four additional declarations and affidavits and three trademark search results. Prior to receipt of these reply papers, this Court spent more than twelve hours researching the issues presented by the motion. While considered, the three trademark search results should have been submitted with the initial moving papers. Saving important factual evidence for reply papers is improper and unfair to the movant's adversary. Jukebox first addressed the alleged infringement issues in a letter to Defendants dated 20 March 1996. Jukebox made its motion one month after sending the 20 March 1996 letter, which appears to be sufficient time to run a trademark registration search on a database.

In addition, the parties were asked twice at the end of oral argument if they had any further evidence or arguments to present. *See* Transcript of Proceedings at 10–11 (19 Apr. 1996) ("19 Apr. 1996 Transcript"). Neither party presented any new evidence or arguments to the Court. *See id.* at 10–12. Late in the afternoon on 22 April 1996, Jukebox submitted Turro Second Reply Dec. which contains additional factual evidence. Submitting this declaration after oral argument left Defendants with no opportunity to reply; it is improper and unfair.

**6.** In its artfully crafted declaration, Jukebox gives the impression it purchased the "MAKE BELIEVE BALLROOM" service mark from WNEW–AM in 1992. *See* Turro Dec. Jukebox, however, only purchased records and other items from WNEW–AM. Jukebox has not presented any evidence it purchased the service mark.

Instead, during oral argument, Jukebox argued "the first user of an abandoned service mark gets rights to use that mark." 19 Apr. 1996 Transcript at 10. Jukebox has not presented any evidence that it was the first user of the allegedly abandoned mark.

Jukebox claims the mark was abandoned in 1992 when WNEW–AM switched to an all-talk format but the trademark registration search submitted by Jukebox shows the registration was not canceled until early 1995. *See* Ninehan Aff., Exh. A.

In addition, Jukebox claims to have started using the mark in 1994, two years after the alleged abandonment by WNEW–AM. Jukebox did not present evidence that it was the first to use the mark. Jukebox was asked twice during oral argument if it wanted to present any further evidence; it did not.[7] *See* 19 Apr. 1996 Transcript at 10–11.

### 2. *Presenting of Evidence of Confusion*

At trial, Jukebox must be prepared to demonstrate a likelihood of confusion caused by Defendants' use of the alleged service marks. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2758 ("[i]t is ... undisputed that liability under § 43(a) requires proof of the likelihood of confusion"). A myriad of factors may be considered in determining whether a likelihood of confusion exists, including:

(1) the degree of similarity between the owner's mark and the allegedly infringing [mark]; (2) the strength of owner's mark; (3) the price of the [services] and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the [services] ... are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the [services] in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

7. While Jukebox might be able to present sufficient evidence to establish its claims, this Court simply cannot guess or assume evidence of in-

*Scott Paper,* 589 F.2d at 1229; *accord CPC Int'l, Inc. v. Caribe Food Distrib.,* 731 F.Supp. 660, 664–65 (D.N.J.1990). While Jukebox discusses the issue of confusion in its moving brief, it only presented one consumer affidavit addressing the issue of confusion. *See* Jukebox Brief at 14–18; Emra Dec.

### C. *New Jersey Common Law Infringement*

Analysis under New Jersey common law for service mark infringement is the same as under section 43(a)(1) of the Lanham Act and a violation of section 43(a)(1) of the Lanham Act leads to a finding of common law infringement. *Barre–Nat'l, Inc. v. Barr Labs., Inc.,* 773 F.Supp. 735, 746 (D.N.J. 1991); *Apollo Distrib. Co. v. Jerry Kurtz Carpet Co.,* 696 F.Supp. 140, 143 (D.N.J. 1988); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1376 (D.N.J.1981). Jukebox has failed to present, for purposes of the requested injunctive relief, the necessary evidence to show improper appropriation of the alleged service marks and confusion among the relevant consumers.

### D. *N.J.S.A. § 56:4–1*

N.J.S.A. § 56:4–1 provides: "No merchant, firm or corporation shall appropriate for his[, her] or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." N.J.S.A. § 56:4–1 is the state statutory equivalent of section 43(a)(1) of the Lanham Act and violation of section 43(a)(1) of the Lanham Act leads to a finding of liability under N.J.S.A. § 56:4–1. *See Apollo Distrib.,* 696 F.Supp. at 143; *National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 519 (D.N.J.1986). Jukebox has failed to present the necessary evidence to show improper appropriation of the alleged service marks and confusion among the relevant consumers.

fringement, unfair competition and passing off exists.

**E.** *New Jersey Common Law Passing Off*

New Jersey recognizes an action for unfair competition where one passes off his or her goods or services as those of another. *SK & F, Co. v. Premo Pharmaceutical Labs., Inc.,* 625 F.2d 1055, 1062 (3d Cir.1980); *Sachs Furniture & Radio Co. v. Sachs Quality Stores Corp.,* 39 N.J.Super. 70, 82–83, 120 A.2d 477 (App.Div.1956); *French Am. Reeds Mfg. Co. v. Park Plastics Co.,* 14 N.J.Super. 450, 454, 82 A.2d 468 (Ch.Div.1951), *aff'd,* 20 N.J.Super. 325, 90 A.2d 50 (App.Div.1952). Passing off encompasses fraudulently marketing goods or services as those of another. *Id.* The mere assertions leveled by Jukebox do not amount to passing off. Jukebox has not shown hiring employees or switching the format of a radio station is improper. Jukebox has also not produced sufficient evidence to indicate Defendants are passing their station off as Jukebox.

*Conclusion*

For the reasons stated above, the Motion for Injunctive Relief is denied. The parties are directed to appear before Magistrate Judge Dennis M. Cavanaugh to arrange an expedited discovery schedule and trial date. No additional motions are to be filed without prior authorization from Judge Cavanaugh.